# EXHIBIT 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JEFF LUCAS,<br><br>                                Plaintiff,<br><br>          -against-<br><br>VERIZON COMMUNICATIONS, INC. and<br>VERIZON MEDIA, INC.,<br><br>                                Defendants. | Index No.<br><br>Plaintiff designates New York County as the place of trial.<br><br>The basis of venue is CPLR § 503 as a substantial part of the events alleged occurred within New York County.<br><br><br>                **SUMMONS** |

*To the above-named Defendants*:

Verizon Communications, Inc.
1095 Avenue of the Americas
New York, NY 10036

Verizon Media, Inc.
770 Broadway
New York, NY 10005

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy

of your answer on Hoguet Newman Regal & Kenney, LLP, within 20 days after the service of

this summons, exclusive of the day of service (or within 30 days after the service is complete if

this summons is not personally delivered to you within the State of New York); and in case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Dated: New York, New York
      June 22, 2020

**HOGUET NEWMAN
REGAL & KENNEY, LLP**

By: _____
    Damian R. Cavaleri
    Steven M. Silverberg
    Miriam J. Manber

Hoguet Newman
Regal & Kenney, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808
*Attorneys for Plaintiff*
*Jeff Lucas*

2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFF LUCAS,

Plaintiff,

-against-

VERIZON COMMUNICATIONS, INC. and
VERIZON MEDIA, INC.,

Defendants.

**VERIFIED COMPLAINT**

Index No.:

**JURY TRIAL DEMANDED**

Plaintiff Jeff Lucas ("Mr. Lucas" or "Plaintiff"), by and through his attorneys Hoguet
Newman Regal & Kenney, LLP, as for his Complaint against Defendants Verizon
Communications Inc. ("Verizon Communications") and Verizon Media Inc. ("Verizon Media")
(together "Verizon"), alleges as follows:

## NATURE OF THE CLAIM

1.      This is an action to save a unique and once-in-a-lifetime opportunity offered to Jeff
Lucas, and the baseless threats and illusory promises from Verizon.  Over the course of Plaintiff
Jeff Lucas's 35-plus year career in the ad sales business, opportunities to lead a premier
organization's global advertising sales are few and far between.  When WarnerMedia presented
him with such an opportunity—to lead all of the ad sales for its high-quality, brand-safe premium
television network content—it was the perfect coda to his career.  Mr. Lucas has spent decades
cultivating deep roots in advertising sales related to high quality premium television network
content.  In 2018, Mr. Lucas was lured to his former position at Verizon Media by the promise that
he would be able to continue doing this same type of work selling quality premium video
television-type content delivered online based on Verizon Media's commitment to substantially
increase its inventory of online, high quality, premium brand-safe video content, premium brand-

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

safe display content, and content marketing.  But this turned out to be a bait-and-switch.  Verizon

Media never fulfilled its promise to develop such content at scale, and when WarnerMedia offered

Mr. Lucas a chance to work on high quality, brand-safe premium television network video content

at scale, he was interested in the opportunity to do the work that Verizon Media never could allow

him to do.  But rather than work out a transition for Mr. Lucas to leave Verizon Media before his

move to WarnerMedia, Mr. Lucas was faced with threats of litigation designed to intimidate him

and prevent him from ascending to the apex of his career, solely because Verizon Media enjoyed

his overall success and did not want him to leave and work for WarnerMedia, a subsidiary of

AT&T.  As a result, Mr. Lucas must seek judicial intervention to protect his opportunity and

address the failure of Verizon Media to live up to its promises.

## PARTIES

2.       Jeff Lucas is a resident of New York County.

3.       Verizon Communications, Inc. is a Delaware Corporation with its principal place

of business in New Jersey.

4.       Verizon Media, Inc. is a Delaware Corporation with its principal place of business

in New York County.

## JURISDICTION & VENUE

5.       The jurisdiction of this Court is invoked pursuant to N.Y. C.P.L.R. §§ 301 and 302.

Defendants transact business in the state of New York.

6.       Venue is properly laid under CPLR § 503 and because a substantial part of the event

alleged occurred within New York County.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## FACTUAL BACKGROUND

7.     Plaintiff Jeff Lucas has decades of experience in the ad sales industry. Over that period of time, he held positions at NBCU, Viacom, Snap, Inc. and Verizon Media.

8.     He has developed an extensive professional network of relationships during his time in the ad sales industry and has developed a reputation as an excellent leader of ad sales departments.

9.     It is important to differentiate between different types of advertising sales roles. The roles are based on the content tied to the ad sales (i.e., what the consumer is viewing when the consumer sees the advertisement) and the context of the content (i.e., how and when they are delivered to the consumer, whether through television, online, billboard or print). As a result, the advertising strategies and business models vary greatly because the content and how it is delivered influences how consumers are targeted and which client decision-makers are approached.

10.    The advertising sales role that Mr. Lucas is seeking with WarnerMedia (President, WarnerMedia Advertising Sales), and the role he previously held at Verizon Media (Head of Ad Sales North America) are entirely separate with respect to these characteristics and consequently inhabit different places in the advertising industry.

11.    First, these roles rely on two wholly distinct methods of delivery. The WarnerMedia role is responsible for sales of ads predominately delivered over its broadcast/cable television networks such as TNT or TBS ("Network Delivery"). Network Delivery results in broader audience targeting because the data available is more limited and the ads are distributed to a large broad-based audience at the same time. Ad sales for content that use Network Delivery is heavily reliant on contextual-based targeting strategies. Verizon Media does not deliver any of its content using Network Delivery.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

12.     Mr. Lucas's role at Verizon Media, however, was exclusively related to sales of ads delivered online, through streaming, desktop or mobile web/app ("Online Delivery") for all of the Yahoo (including Yahoo Mail), AOL, Huffington Post brands as well as the Microsoft brands, MSN and XBOX.  Online Delivery is not tied to any set schedule, allowing the consumer to view the content on demand.  Online Delivery also has more individualized data available, using deep data insights garnered from the consumer's content consumption history, location tracking, mail, mail purchase receipts, carrier data, search requests and other data points allowing for more refined audience targeting and ads that are individualized.

13.     Ad sales for Verizon Media's non-premium content that use Online Delivery, which comprised the majority of the content Mr. Lucas sold during his time with Verizon Media, primarily use programmatic sales: an automated process that leverages the available audience information for highly targeted individualized sales that is typically independent from the content being viewed by the individual.  Content does not need to be contextual in nature.  Content using Online Delivery may also utilize direct sales, but it is typically limited to premium content and only made up a smaller part of the revenue Mr. Lucas generated during his time with Verizon Media.  While the role with WarnerMedia may include oversight of a very small amount of content using Online Delivery, he would have no oversight of any programmatic sales.

14.     Second, the content sold for each of the roles is dramatically different.  The WarnerMedia role is almost exclusively focused on premium video content, which is high quality, television type, brand-safe (i.e., designed to avoid associations with negative content) entertainment/news/sports/finance programming using Network Delivery ("Network Premium Video Content").  Network Premium Video Content is professionally produced, often episodic, scripted or non-scripted, with contextual sponsorship opportunities differentiating itself in the

4

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

marketplace by creating a deeper resonance with the consumer. Advertisers seek to purchase Network Premium Video Content for advertisements using broad demographic information rather than targeted individual consumer data. Network Premium Video Content advertising sales is focused on the type of viewer the content attracts using the context of the content both based on the specific content itself and where and when the content is delivered. Verizon Media does not sell any ads related to Network Premium Video Content.

15.    In Mr. Lucas's role with Verizon Media, he was primarily selling lower priced, non-premium display content, sold programmatically, which is usually an article viewed on a webpage, similar to magazine-type content. This can be premium (professionally produced, brand safe and with the ability to provide increased demand) or non-premium (generic articles and undifferentiated from other content available), and, given that it uses Online Delivery, is highly targetable using programmatic sales. Online display content was Mr. Lucas's principal focus of advertising sales during his time with Verizon Media, making up more than 75% of the revenue he generated. He also had responsibilities related to sales of premium video content that used Online Delivery, but that content was limited and did not make up a substantial part of my revenue. Online display content would be a minimal part of my responsibilities in my role at WarnerMedia with no responsibilities related to programmatic sales.

16.    The Verizon Media position also had Online Delivered content marketing responsibilities. Content marketing is bespoke content online that may not explicitly promote a brand but is intended to stimulate interest in its products or services. Mr. Lucas's department at Verizon Media sold some premium content marketing using Online Delivery, but it was very small. The role at WarnerMedia would not have these responsibilities.

5

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

17.     Given that the roles deal at issue with different types of content that rely on different delivery methods, the client companies would interact with them distinctly. Network Television-based advertising, like what Mr. Lucas would perform at WarnerMedia, usually has a dedicated agency client buying team and associated line-item budget. Non-television advertising, primarily consisting of Online Delivered programmatic sales, typically has its own marketing budget and its own dedicated client-buying team in an agency company's marketing department. The specific client decision-makers and strategies for the ad sales related to WarnerMedia's and Verizon Media's content are distinct and thus the roles are not competitive.

18.     Prior to 2016, Mr. Lucas's positions had primarily focused on ad sales related to Network Premium Video Content, specifically episodic content through his work with NBCU Entertainment, NBCU Sports/Olympics, Viacom Entertainment (Comedy Central, Spike TV), Viacom Music (MTV, VH1), and Viacom Kids (Nickelodeon).

19.     During his time at Viacom, Mr. Lucas ran advertising sales for 22 Cable Networks representing approximately 25% of the total television cable industry's audience. He introduced an industry leading custom cross-platform content marketing engine, Viacom Velocity, and a data-driven television ad solution called Viacom Vantage, creating and packaging targetable programmatic audience segments.

20.     Following his time at Viacom, Mr. Lucas was hired as the Global Head of Sales at Snap Inc. (then Snapchat), to develop its digital ad sales platform. At the time he began at Snap, ad sales were driven mostly by premium brand advertisers purchasing video mobile inventory to access a younger, harder to find audience. During his tenure at Snap, programmatic ad solutions were introduced and Snap's premium, professionally produced, original video television-like content was marketed as part of Snap's Discover platform.

6

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

21.     Snap's Discover Platform shows were similar to the Network Premium Video Content that Mr. Lucas had substantial experience selling during his time at Viacom, and his experience in developing the Viacom Velocity and Vantage divisions provided a foundation for Mr. Lucas to take his premium ad sales and content creation expertise and merge it with his ad sales knowledge to further enhance the Snap ad sales platform driving the fastest revenue growth for a digital company in history at scale during his tenure.

22.     In early 2018, Mr. Lucas's deep experience in Network Premium Video Content ad sales, knowledge of direct/programmatic display ad sales and extensive client contact list led Tim Armstrong, CEO and Founder of Oath (rebranded to Verizon Media in January 2019), to hire Mr. Lucas for the position of Vice President, Head of America Sales.

23.     Mr. Armstrong represented to Mr. Lucas that he would be looking to Mr. Lucas to monetize Oath/Verizon Media's soon-to-be expanded premium video content with premium brand advertisers. Mr. Armstrong expressed his vision of building a premium layer of video content sales over an existing base of premium video/display content executed programmatically using deep data insights to drive overall revenue.  He discussed this in the context of possibly acquiring a Viacom-like Network Premium Video Content producer.  But first, Oath/Verizon Media would need to develop incremental premium video/Display content to sell to premium content advertisers.  This appealed to Mr. Lucas because of his vast experience with premium content and premium content advertisers.

24.     While discussing compensation for the position, Mr. Lucas stated that he was looking for a compensation plan similar to what he received at during his time at Viacom and Snap.

7

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

25.    The initial offer from Mr. Armstrong of base salary with bonus and equity did not meet Mr. Lucas's compensation request, but to bridge the gap between the offer and the request, Oath/Verizon Media offered additional compensation entirely contingent on the sales of premium content offerings at scale.

26.    Based on the stated commitment to develop Oath/Verizon Media-based owned and operated premium content, Mr. Lucas accepted a compensation package that included approximately one-third of his annual compensation (either $750,000 or $1,500,000 based on meeting certain thresholds) tied to sales of such Oath/Verizon Media owned and operated premium content broken down and described as Display Reserve (Premium Display Content), Video Reserve (Premium Video Content) and RYOT (Content Marketing), in a supplement to his employment agreement (the "Premium Content Bonus"). The Premium Content Bonus was memorialized in the Performance Bonus Program document provided with Mr. Lucas's employment agreement, both of which Mr. Lucas signed on April 18, 2018. The documentation related to the acceptance of the equity portion of Mr. Lucas's compensation was first provided months later in September 2018 in the form of a Restricted Stock Unit Agreement between Mr. Lucas and Verizon Communications (the "RSU Agreement").

27.    Mr. Lucas began his position with Oath/Verizon Media in April 2018, shortly after signing the employment agreement. He was responsible for Direct/Programmatic Digital Advertising Sales in the Americas across Verizon Media (consisting of online owned and operated sites representing AOL, Huffington Post, Yahoo, Yahoo Mail, and their associated brands, as well as representing the sale of Microsoft's Global MSN and XBOX digital brand offerings), and was also responsible for the Demand Side Platform ("DSP"). The DSP programmatically sells the inventory of third-party publishers packaged with Verizon Media's owned and operated digital

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

sites. In January 2019, the Exchange Sales Group was added to Mr. Lucas's responsibilities, which includes the programmatic sale of similar owned and operated/third party inventory to third party DSPs. The revenue generated by these two programmatic groups, the DSP and the Exchange Sales Group represented approximately 75% of the revenues Mr. Lucas's advertising sales generated for Verizon Media. Direct sales of premium video/display content did not make up a substantial portion of the revenue from Mr. Lucas's department due to limited scale.

28.     These responsibilities at the time were predominantly related to programmatic ad sales rather than premium content-based ad sales. The Oath/Verizon Media premium content at that time was insubstantial, but, based on Mr. Armstrong's representations, Mr. Lucas expected it to increase. It never did in a material way. Verizon Media was unsuccessful in generating any substantial increase in its supply of Premium Display Content, Premium Video Content or Content Marketing.

29.     Upon arrival at Verizon Media, Mr. Lucas was informed he would also be overseeing a number of additional groups that provided global support to all sales: The Global Business to Business Marketing Group, The Global Client Service Organization, and The Global Business Operations Group. With respect to international sales, this responsibility was to provide support only and did not include any direct international sales responsibility.

30.     As Mr. Lucas continued in his position and provided substantial value to Verizon Media, it became apparent that Verizon Media would never develop sufficient premium brand-safe monetizable content/inventory to provide Mr. Lucas with an opportunity to realize the Premium Content Bonus. In fact, Verizon Media failed to create incremental, brand-safe, premium display inventory, did not produce a material amount of owned and operated monetizable premium video inventory and generated minimal RYOT content marketing offerings in 2018/early 2019.

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

31.     Mr. Lucas first brought the missing content associated with the Premium Content Bonus up with his boss, CEO Guru Gowrappan, in a conversation surrounding his first-year annual review. Mr. Gowrappan encouraged him to pursue with Human Resources what was promised. The overall review provided to Mr. Lucas was overwhelmingly positive.

32.     When Mr. Lucas approached Courtney Panik and Christy Fazeli in Human Resources to discuss the impossibility of receiving the Premium Content Bonus, they spoke with the Finance department and confirmed that there was no money associated with the Premium Content Bonus. No offer of any replacement for the missing compensation was presented to Mr. Lucas.

33.     On information and belief, Oath/Verizon Media had no intention, nor ability to develop sufficient premium content to give Mr. Lucas an opportunity to achieve the Premium Content Bonus, and only offered it to induce Mr. Lucas to accept the position as well as a reduced compensation package. In fact, Verizon/Verizon Media executives have stated numerous times, and as recently as January 2020 that it would not be investing in content production.

34.     During Mr. Lucas's time at Verizon Media, despite his extraordinary performance, which included turning around Mr. Gowrappan's sales department, building a new diverse, strong senior sales management team and generating tens of millions of dollars in incremental revenues, Mr. Lucas's role had been reduced (the Latin American responsibilities were moved to International) and was further limited when, in March 2019, Mr. Gowrappan hired his good friend and former boss Iván Markman as Chief Business Officer ("CBO").

35.     In January 2019, Mr. Gowrappan, asked Mr. Lucas to shift his reporting line to the incoming CBO, Mr. Markman. Earlier in his career, Mr. Markman had hired Mr. Gowrappan to work for him at Yahoo. Mr. Gowrappan stated that he needed one of his "own people" as a direct-

10

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1    Case 1:20-cv-05542    Document 1-2    Filed 07/17/20    Page 14 of 58    RECEIVED NYSCEF: 06/22/2020

report because the majority of his other direct-reports were former Verizon corporate employees. He told Mr. Lucas that he would not be successful unless he could hire Mr. Markman and asked if Mr. Lucas would help him out.

36.    Mr. Gowrappan promised Mr. Lucas that in return for agreeing to report to Mr. Markman, he would expand Mr. Lucas's responsibilities from North America sales to include all International Ad Sales.  Mr. Gowrappan also introduced the possibility of moving Ecommerce to expand Mr. Lucas's scope of responsibilities

37.    Mr. Gowrappan also committed to Mr. Lucas that Mr. Markman would not interact externally with clients.

38.    Mr. Gowrappan never moved international ad sales to Mr. Lucas.

39.    Mr. Gowrappan never moved any Ecommerce responsibilities to Mr. Lucas to expand the scope of his responsibilities

40.    Mr. Markman upon arrival immediately requested a list of the top clients that he should meet and then proceeded to regularly meet with clients despite Mr. Gowrappan's assurances to the contrary.

41.    Throughout 2019 and until the time of his departure on May 8, 2020, Mr. Lucas was the head of North America Ad Sales and Global Client Solutions (International sales support functions, almost no direct International sales responsibility).

42.    On December 11, 2019, AdAge, a well-known publication in the advertising industry, published an article covering the changes in broadcast/cable television ad sales leadership in 2019.  It noted that the only open television ad sales leadership position not filled was WarnerMedia's global head of ad sales.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

43.     In the AdAge article, Mr. Lucas's was the only name mentioned as a possible candidate to fill the WarnerMedia vacancy, and the author referenced Mr. Lucas's experience at Viacom, including his involvement with the development of Viacom Vantage and Velocity, as why she believed Mr. Lucas would be the right candidate for the role.  The role would leverage Mr. Lucas's experience in the traditional TV business, as well as digital, social and programmatic ad sales.

44.     Mr. Lucas was surprised to see his name mentioned in the article, but agreed with the author's assessment and thought the WarnerMedia position would be the opportunity that his 35 plus-year career had been building to.  And at the age of 59, he did not expect there to be similar opportunities in the future.

45.     The vacant title at WarnerMedia was "President, WarnerMedia Advertising Sales," and its responsibilities include overseeing WarnerMedia's media and premium episodic television based content, multiplatform advertising strategies and initiatives across WarnerMedia's portfolio of television network brands (CNN, HLN, TNT, TBS, truTV, Cartoon Network, Adult Swim).  It would return Mr. Lucas to a position with a similar scope as his responsibilities at NBC and Viacom, and to a role similar in geographic scale to Snap.  It would also allow him to return to work with creators of premium television content, which was not available at Verizon Media.  The WarnerMedia position would not include oversight responsibilities for programmatic ad sales, which made up the majority of Mr. Lucas's responsibilities at Verizon Media.

46.     On December 14, 2019, shortly after the AdAge article was published, Mr. Markman sent Mr. Lucas a text message attaching the article with a question mark in the text.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

47.     Mr. Gowrappan proceeded to contact Mr. Lucas on December 17, 2019 while Mr. Lucas was out of the country on vacation suggesting Mr. Lucas call him.  Mr. Lucas complied and called him that evening.

48.     During their phone call, Mr. Gowrappan mentioned he heard a rumor that Mr. Lucas was leaving Verizon Media to go to WarnerMedia.  Mr. Lucas suggested that Mr. Gowrappan did not hear a rumor, but had read it in an AdAge article.  Mr. Gowrappan agreed and asked Mr. Lucas whether he was looking for another position and mentioned that he valued loyalty. Mr. Lucas replied that he was not in the market looking for another position and that he receives calls periodically about other positions when they open up, even though they are rarely opportunities he would consider.  Mr. Lucas mentioned that when other companies approach him, he will usually listen.  Mr. Lucas stated that he did not have a contractual commitment and that he listened because he would always want to do what is best for his family for the time remaining in his career.

49.     As the call continued, Mr. Lucas asked Mr. Gowrappan if he would speak with a much larger company if the company called to recruit him into a CEO role.  Mr. Gowrappan replied yes, but stated that he has a two-year commitment remaining to Verizon Media and was not able to move now.  Mr. Gowrappan ended the call by telling Mr. Lucas that Mr. Lucas has been delivering great results and that he did not feel good about the recent article.

50.     The following morning, Mr. Markman attempted to contact Mr. Lucas while Mr. Lucas was still on vacation and later texted Mr. Lucas that "Guru didn't get the warm and fuzzy on this one based on your guys call.  Will try later to make sure we are clear".  Mr. Lucas responded and after playing phone tag for a day, Mr. Lucas spoke with Mr. Markman about his conversation with Mr. Gowrappan.

13

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

51. When he spoke with Mr. Markman, Mr. Lucas reviewed his conversation with Mr. Gowrappan and the questioning of loyalty. Mr. Lucas stated to Mr. Markman that Mr. Lucas did not have a contractual commitment with Verizon Media, and that he only wants to do what is best for his family over the remaining years in his career. Mr. Lucas mentioned that he was promised a number of things by Verizon Media when hired, which Mr. Gowrappan knew about, and then again by Mr. Gowrappan in January 2019 that were never delivered, including responsibility for International Sales and the possible movement of ECommerce to Mr. Lucas. Mr. Lucas also mentioned the Premium Content Bonus that he was promised when hired, which represented approximately one third of his total compensation package and never realized. Mr. Markman confirmed that Mr. Gowrappan had mentioned to him that Mr. Lucas was not happy about the unavailability of the Premium Content Bonus. Mr. Markman also asked that if Mr. Lucas were ever considering another opportunity, he should approach Mr. Markman first before accepting an offer to see if there was anything Mr. Markman could do to keep him at Verizon Media and expressed how well Mr. Lucas had performed at Verizon Media and they wanted him to stay.

52. At no time during that call or any other communication in 2019 or early 2020, did Mr. Gowrappan or Mr. Markman mention any non-competition restriction, nor did either state that the WarnerMedia position would violate any terms of Mr. Lucas's agreements with Verizon.

53. In early 2020, Mr. Lucas engaged in detailed discussions with WarnerMedia regarding the vacant position described in AdAge. As those discussions turned serious, Mr. Lucas decided to follow the guidance of Mr. Markman and let him know over the last week of February that he received a serious offer from WarnerMedia and that he wanted to accept the position. He verbally communicated the details of the offer to Mr. Markman during the week of February 27, 2020, and later via text on March 3, 2020.

14

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

54.     Mr. Lucas had multiple conversations with Mr. Markman and Andy Nebens (Chief People Officer) during the first week of March to discuss his intent to accept the WarnerMedia position and the timing and process of a transition.  In the first conversation with Mr. Nebens, Mr. Nebens offered a potential increase in compensation to get him to stay with Verizon Media.  Mr. Lucas kindly refused and stated that he wanted to return to selling premium television content (Network Premium Video Content) and work with premium television content creators again, an opportunity which never materialized at Verizon Media.

55.     At their next meeting, Mr. Nebens informed Mr. Lucas that he had agreed to a non-compete.  Mr. Lucas informed Mr. Nebens that he did not recall ever discussing or agreeing to a non-compete, nor seeing it in his employee agreement.  Mr. Nebens informed Mr. Lucas it was not in his employment agreement but instead attached as an exhibit to his RSU Agreement, which he accepted five months after starting with Verizon Media.  Mr. Lucas suggested that burying the non-compete deep in the small print of the RSU Agreement already promised at the time of hiring was sneaky.  Mr. Nebens smiled and told Mr. Lucas he could not agree to that description.

56.     On March 13, 2020, Verizon Media's outside counsel sent a letter to Mr. Lucas's attorney threatening to bring legal action and asserting that the positions they believed Mr. Lucas was contemplating with WarnerMedia and Xandr (another AT&T subsidiary) were in violation of the non-competition provisions in exhibits to the RSU Agreement he signed during his employment with Verizon Media.  The Verizon Media attorney requested a copy of the description of the WarnerMedia role (and Xandr role, though one had never been discussed) and sought confirmation that Mr. Lucas was in compliance with his confidentiality obligations.

57.     Having nothing to hide, on March 17, 2020, Mr. Lucas's attorney provided a description of the WarnerMedia position demonstrating that the position was not competitive.  On

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

March 19, 2020, Mr. Lucas's attorney followed up with a letter explaining that Verizon Media and WarnerMedia could not compete because the content at issue was of an entirely different nature: Mr. Lucas was unable to sell ads related to Network Premium Video Content at Verizon Media, instead selling direct and programmatic ads, primarily for display content; Network Premium Video Content ad sales would be his primary responsibility at WarnerMedia, which was virtually absent at Verizon Media; and he would have no responsibility for programmatic ads at WarnerMedia, which was the main source of advertising sales revenue at Verizon Media. (Although Xandr does offer programmatic solutions, this was not a role he was considering.) Furthermore, he was in compliance with all confidentiality provisions, and the differing nature of the work meant that the little, if any, confidential Verizon Media information in my possession of which he may be aware would not be of much use to WarnerMedia.

58.    Following extensive discussions and correspondence, Verizon Media continued to threaten legal action to enforce the non-competition provisions in the exhibit to the equity agreements if Mr. Lucas were to move forward with the WarnerMedia position.

59.    In response, in an effort to clarify and potentially address Verizon Media's concerns, Mr. Lucas requested that Verizon Media identify the basis for its assertion that the WarnerMedia position would violate any enforceable non-competition restriction.  Such an explanation never came; Verizon Media only identified general job responsibilities and simply stuck by its assertion that the positions were competitive because Mr. Lucas would be selling ads and performing similar functions.

60.    Verizon Media intentionally ignored the fundamental differences between the responsibilities of each position.  These included differences between the companies' inventories of content, that Mr. Lucas would be selling ads related to Network Premium Video Content

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

unavailable at Verizon Media, the differences between the strategies and way in which ad sales for premium episodic television content (such as WarnerMedia's content) differs from display/programmatic content (such as Verizon Media's content), and that Mr. Lucas was simply not privy to any information that would give WarnerMedia any advantage.

61.    For Mr. Lucas, the opportunity at WarnerMedia was what was missing from Verizon Media, though promised to him when he started.  There was virtually no premium video content to sell and no way to interact with the content creators and put together advertising strategies leveraging premium video content.   He was stuck selling almost exclusively direct/programmatic non-premium lower priced display content, which was not the type of work he was promised when he accepted the position at Verizon Media and not the type of work he wanted to continue doing as his career was at its height.

62.    In an April 3, 2020 letter from Verizon Media, however, the company's real reason for threatening Mr. Lucas with legal action was laid bare: "the Company hopes Mr. Lucas remains a Verizon Media employee."  Given Mr. Lucas's track record at Verizon Media of course they wanted to keep him in his position: he was an excellent employee, at a bargain rate, because more than a third of the compensation he was promised in 2018 and 2019 was simply not achievable and never delivered.

63.    When Mr. Lucas reported Verizon Media's position to WarnerMedia, WarnerMedia was clear that it would not be able to hire him with the threat of litigation from Verizon Media.  Verizon Media's bad faith threat of litigation would cost Mr. Lucas the biggest opportunity of his career.

64.    What is more, during this time Mr. Lucas had no ability to challenge Verizon Media's position as the courts in New York were closed in light of the COVID-19 pandemic, and

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

while the matter was important to him, it was not essential and would have to wait until the environment improved.

65.    Having considered his options, Mr. Lucas notified Mr. Markman on April 17, 2020, that despite Mr. Lucas's multiple offers to work out an amicable transition, Mr. Lucas's last day would be May 4, 2020.  Mr. Lucas felt that Verizon Media and Verizon Media's lawyers were not operating in good faith, and merely stalling in order to block the chance for Mr. Lucas to join WarnerMedia because it was owned by AT&T.  Mr. Lucas was told numerous times by both Mr. Markman and Mr. Nebens that Verizon would not be as tough on enforcing the non-compete if WarnerMedia was not owned by AT&T, but they never elaborated on what that actually meant.

66.    Both Mr. Markman and Mr. Nebens stated that Verizon has to send a message to AT&T and other Verizon employees that they could not leave Verizon to work at AT&T.  Mr. Lucas was told by both Mr. Markman and Mr. Nebens that if they let Mr. Lucas go to AT&T , how, for example, could they say no to Verizon Consumer Group EVP & CEO, Ronan Dunne, if he wanted to leave to go to work for AT&T or T-Mobile.  During that conversation, it was also discussed that the courts are not open to challenge Verizon Media's decision that Mr. Lucas's offered position at WarnerMedia was violating a non-compete provision.

67.    Mr. Lucas decided to leave Verizon regardless, and resigned effective as of May 8, 2020, four days later than originally planned, at Mr. Markman's request to facilitate better messaging.

68.    When Mr. Lucas resigned, he did not have a position in place and believed that the opportunity with WarnerMedia was lost.  In conversation the week of April 21, 2020, following the date Mr. Lucas notified Verizon Media of his plans to leave, Mr. Lucas informed Mr. Nebens

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

that he felt the WarnerMedia opportunity was lost and Mr. Nebens suggested once again for Mr. Lucas to remain with Verizon Media since he had no job offer pending. Mr. Lucas declined.

69.     However, discussions with WarnerMedia resumed since his departure and WarnerMedia formally offered the position to Mr. Lucas contingent on providing an assurance that Verizon would not bring an action seeking to enforce the restrictive covenant. The offer will expire on June 30, 2020.

70.     On June 5, 2020, by letter, Mr. Lucas sought an assurance from Verizon that it would not continue its threat of litigation given that the non-competition provision was not enforceable with respect to the WarnerMedia position and he was no longer a Verizon Media employee.

71.     Instead, on June 12, 2020, despite not being a Verizon Media employee for more than a month, Verizon Media continued its baseless threat, focused solely on its assertion that WarnerMedia is a competitor and Mr. Lucas would be performing similar functions for WarnerMedia as he performed for Verizon Media.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Declaratory Judgment

72.     Mr. Lucas repeats and realleges the allegations set forth in paragraphs 1 through 71 as if fully set forth herein.

73.     Pursuant to CPLR § 3001, Mr. Lucas requests that the Court enter judgment declaring that the non-competition restrictions in Exhibit B to the equity agreements are invalid and unenforceable under New Jersey law with respect to the position of President, WarnerMedia Advertising Sales and its oversight of the WarnerMedia's Television Assets.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

74.     A justiciable controversy exists, as detailed above, due to the representations from Verizon Media's counsel threatening to enforce such restriction to prevent Mr. Lucas from starting in the position at WarnerMedia.

75.     Mr. Lucas is unable to begin his position with WarnerMedia with the threat of litigation from Defendants.

76.     The conflicting views of the enforceability of Exhibit B to the equity agreements between Plaintiff and Defendants render the parties' rights and obligations uncertain, and this issue is accordingly ripe for a declaratory judgment.

## SECOND CAUSE OF ACTION
## Injunctive Relief

77.     Mr. Lucas repeats and realleges the allegations set forth in paragraphs 1 through 76 as if fully set forth herein.

78.     Unless injunctive relief is granted, Mr. Lucas will suffer irreparable harm including, but not limited to, loss of livelihood and loss of business opportunities.

79.     Mr. Lucas has no adequate remedy at law for his present and threatened injury.

80.     Accordingly, Mr. Lucas is entitled to preliminary and permanent injunctive relief enjoining and restraining Defendants from attempting to enforce or enforcing the non-competition provisions in their equity agreements with Mr. Lucas with respect to the position of President, WarnerMedia Advertising Sales

## THIRD CAUSE OF ACTION
## Tortious Interference with Business Relations

81.     Mr. Lucas repeats and realleges the allegations set forth in paragraphs 1 through 80 as if fully set forth herein.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.          22 of 27

82.    Mr. Lucas has a business relationship with WarnerMedia and has an offer of employment for the position of President, WarnerMedia Advertising Sales.

83.    Mr. Lucas disclosed this relationship to Defendants, including the offer of employment.

84.    Defendants have threatened to initiate litigation to enforce non-competition provisions that Defendants know are not enforceable with respect to the position of President, WarnerMedia Advertising Sales.

85.    Defendants' threat of litigation, if not lifted by June 30, 2020, will cause the offer of employment for the position of President, WarnerMedia Advertising Sales to be rescinded.

86.    As a result of the foregoing, in the event an injunction is not issued and the employment offer is rescinded due to Defendants' baseless threats, Mr. Lucas will sustain irreparable harm to his career and severe economic injury for which he is entitled to monetary compensation in an amount to be determined at trial but in any event not less than $1,000,000.

### FOURTH CAUSE OF ACTION
### <u>Fraudulent Inducement to Contract</u>

87.    Lucas repeats and realleges the allegations set forth in paragraphs 1 through 86 as if fully set forth herein.

88.    Prior to entering into an employment agreement with Defendants, Tim Armstrong, CEO of Oath now Defendant Verizon Media, represented that Oath would continue and increase development of premium content.

89.    Mr. Armstrong knew that it was not true, but made the statement to induce Mr. Lucas to accept approximately one-third of his compensation in the form of bonus compensation related to advertising sales relating to the premium content, the Premium Content Bonus.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

90.     Mr. Lucas relied on Mr. Armstrong's representation and entered into the employment agreement.

91.     Mr. Lucas later learned that there would not be sufficient premium content for him to achieve the Premium Content Bonus promised to him when he entered into the employment agreement.

92.     As a result of the foregoing, Mr. Lucas has been harmed in an amount to be determined at trial, but in no event less than seven hundred fifty thousand dollars ($750,000).

**FIFTH CAUSE OF ACTION**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

93.     Lucas repeats and realleges the allegations set forth in paragraphs 1 through 92 as if fully set forth herein.

94.     Implied in all contracts, including the April 18, 2018 employment agreement and Performance Bonus Program between Oath (now Verizon Media) and Mr. Lucas, is a covenant of good faith and fair dealing, which is breached when a party to the contract acts in a manner that, although not constituting a breach of contract, deprived the other party to the contract the right to receive the benefit of the agreement.

95.     Mr. Lucas performed all of his material obligations under the Employment Agreement and Bonus Program to the extent possible.

96.     Defendants failed to provide the premium content required for him to satisfy the conditions of the Performance Bonus Program, undermining the spirit of the agreement between the parties and breaching the implied covenant of good faith and fair dealing.

97.     As a result of the foregoing, Mr. Lucas has been damaged in an amount to be determined at trial, but in no event less than seven hundred fifty thousand dollars ($750,000).

22

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jeff Lucas respectfully requests that this Court enter judgment and grant the following relief:

a.     An Order preliminarily and permanently enjoining and restraining Defendants, their partners, officers, directors, principals, agents, servants, employees, successors and assigns, and all other persons in active concert, privity or in participation with Defendants, from attempting to enforce or enforcing the non-competition provisions in their equity agreements with Plaintiff with respect to the position of President, WarnerMedia Advertising Sales;

b.     In the event there is no resolution prior to June 30, 2020, award Plaintiff an amount of not less than one million dollars ($1,000,000) as a result of Defendants' tortious interference in Plaintiff's relationship with WarnerMedia;

c.     Award Plaintiff an amount of not less than seven hundred fifty thousand dollars ($750,000) as a result of Defendants' fraudulent inducement;

d.     Award Plaintiff an amount of not less than seven hundred fifty thousand dollars ($750,000) as a result of Defendants' breach of the covenant of good faith and fair dealing;

e.     Award Plaintiff costs and expenses of this action together with reasonable attorneys' fees; and

f.     Such other and further relief as this Court deems just and proper.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1     Case 1:20-cv-05542   Document 1-2   Filed 07/17/20   Page 27 of 58   RECEIVED NYSCEF: 06/22/2020

Dated: New York, New York
        June 18, 2020

**HOGUET NEWMAN
REGAL & KENNEY, LLP**

By: _____

Damian R. Cavaleri
Steven M. Silverberg
Miriam J. Manber

Hoguet Newman
Regal & Kenney, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808

*Attorneys for Plaintiff*
*Jeff Lucas*

24

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

<u>VERIFICATION</u>

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

      Jeff Lucas, being duly sworn deposes and says, that deponent is the plaintiff in this

action; that deponent has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to deponent's own knowledge, except as to the matters therein stated to be

alleged upon information and belief, and as to those matters, believes to be true.


                                        Jeff Lucas

Sworn to before me this
_22_ day of June, 2020

Notary Public

Damian Cavaleri
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02CA6235300
Qualified in New York County
Commission Expires 03/31/2023

25

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.                                                                27 of 27

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:    **HON. JENNIFER G. SCHECTER**      PART      **IAS MOTION 54EFM**

*Justice*

-------------------------------------------------------------------------------X

JEFF LUCAS,

                              Plaintiff,

                  - v -

VERIZON COMMUNICATIONS, INC.,VERIZON MEDIA, INC.

                              Defendants.

-------------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 652529/2020 |
| MOTION DATE | |
| MOTION SEQ. NO. | 001 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18

were read on this motion to/for                 INJUNCTION/RESTRAINING ORDER               .

Upon the foregoing documents, it is ORDERED that Plaintiff's motion is DENIED. Plaintiff established a likelihood of success on the merits by demonstrating that the restrictive covenant is likely unenforceable (*BDO Seidman v Hirshberg*, 93 NY2d 382, 388-93 [1999]; *see FP UC Holdings, LLC v Hamilton*, 2020 WL 1492783, at *11 [Del Ch Mar. 27, 2020], citing *Ascension Ins. Holdings, LLC v Underwood*, 2015 WL 356002, at *5 [Del Ch Jan. 28, 2015]); thus, if defendants moved to preliminarily enjoin him from working for Warner such a motion would likely be denied.  Nonetheless, plaintiff's motion for injunctive relief must be denied because he has not demonstrated irreparable harm (*Harris v Patients Medical, P.C.*, 169 AD3d 433, 434-35 [1st Dept 2019]).  If Warner refuses to hire plaintiff due to Verizon's litigation threats based on what appears to be an unenforceable restrictive covenant, plaintiff may seek to recover monetary damages in the form of lost earnings on a claim for tortious interference with business relations (*see Amaranth LLC v J.P. Morgan Chase & Co.*, 71 AD3d 40, 47 [1st Dept 2009]; *accord Sprecher v Thibodeau*, 169 AD3d 407 [1st Dept 2019]).  If plaintiff is indeed unable to work at Warner, he may file an amended complaint specifically seeking those damages.  A telephonic preliminary conference will be held on July 27, 2020 at 3:00 (plaintiff shall circulate a dial-in number 30 minutes beforehand).  The parties' joint letter shall be e-filed and emailed to the court at least one week before the conference.

20200629160733J/SCHECTERJESBF70BBEAD4505AAB05D28643F18C5

_____                                    _____
**6/29/2020**                                                  **JENNIFER G. SCHECTER, J.S.C.**
**DATE**

CHECK ONE:    [ ] CASE DISPOSED    [X] NON-FINAL DISPOSITION

                      [ ] GRANTED   [X] DENIED   [ ] GRANTED IN PART   [ ] OTHER

652529/2020   LUCAS, JEFF vs. VERIZON COMMUNICATIONS, INC.                      Page 1 of 1
Motion No.  001

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFF LUCAS,

        Plaintiff,

    v.

VERIZON COMMUNICATIONS, INC. and
VERIZON MEDIA, INC.,

        Defendants.

Index No. 652529/2020

**ORDER GRANTING ADMISSION *PRO
HAC VICE*
OF LARRY L. TURNER**

Larry L. Turner, having applied to this Court for admission *pro hac vice* to represent Defendants Verizon Communications, Inc. and Verizon Media, Inc. in the above-captioned matter, and said application having been supported by an affirmation of John Guyette, a member of the Bar of the State of New York and attorney of record herein for Verizon Communications, Inc. and Verizon Media, Inc., an affidavit of the application dated July 1, 2020, and a Certificate of Good Standing, and the Court having reviewed the foregoing submissions and due deliberation having been had, it is therefore

ORDERED that the motion is GRANTED and Larry L. Turner is permitted to appear and to participate in this action on behalf of Verizon Communications, Inc. and Verizon Media, Inc.; and it is further

ORDERED that Mr. Turner shall at all times be associated herein with counsel who is a member in good standing of the Bar of the State of New York and is attorney of record for the parties in questions and all pleadings, briefs and other papers filed with the Court shall be signed the attorney of record, who shall be held responsible for such papers and for the conduct of this action; and it is further

ORDERED that, pursuant to §520.11 of the Rules of the Court of Appeals and §602.2 of the Rules of the Appellate Division, First Department, the attorney hereby admitted *pro hac vice* shall abide, by the standards of professional conduct imposed upon members of the New York Bar, including the Rules of the Courts governing the conduct of attorneys and the Disciplinary Rules of the Code of Professional Responsibility; and it is further

ORDERED that Mr. Turner shall be subject to the jurisdiction of the Courts of the State of New York with respect to any acts occurring during the course of his participation in this matter, and it is further

ORDERED that said counsel shall notify the Court immediately of any matters or event in this or any other jurisdiction which affects his standing as a member of the Bar.

SO ORDERED

Dated: July 10, 2020

_____
Jennifer G. Schecter, JSC

2

Case 1:20-cv-05542 Document 1-2 Filed 07/17/20 Page 32 of 58

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| PRESENT: | __HON. JENNIFER G. SCHECTER__ | PART | **IAS MOTION 54EFM** |
|---|---|---|---|
| | *Justice* | | |

-----------------------------------------------------------------------------X

JEFF LUCAS,

                             Plaintiff,

                      - v -

VERIZON COMMUNICATIONS, INC.,VERIZON MEDIA, INC.,

                           Defendants.

-----------------------------------------------------------------------------X

| INDEX NO. | 652529/2020 |
|---|---|
| MOTION SEQ. NO. | 002 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 21, 22, 23, 24, 25 were read on this motion to/for            PRO HAC VICE           .

Upon the foregoing documents, the motion is GRANTED in accordance with the separately e-filed order (Dkt. 26).

2020071018525JSCHECTEC6A2E2DE7E7D43A18AAAD9690EDBE6DB

| __7/10/2020__ | | | __JENNIFER G. SCHECTER, J.S.C.__ |
|---|---|---|---|
| **DATE** | | | |

| CHECK ONE: | | CASE DISPOSED | [ ] | | [X] | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|---|---|
| | [X] | GRANTED | [ ] DENIED | | [ ] | GRANTED IN PART | [ ] OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | [ ] REFERENCE |

652529/2020  LUCAS, JEFF vs. VERIZON COMMUNICATIONS, INC.
Motion No. 002

Page 1 of 1

1 of 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JEFF LUCAS, | **FIRST AMENDED VERIFIED COMPLAINT** |
| Plaintiff, | |
| -against- | Index No.: 652529/2020 |
| VERIZON COMMUNICATIONS, INC. and VERIZON MEDIA, INC., | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Jeff Lucas ("Mr. Lucas" or "Plaintiff"), by and through his attorneys Hoguet Newman Regal & Kenney, LLP, as for his First Amended Complaint against Defendants Verizon Communications Inc. ("Verizon Communications") and Verizon Media Inc. ("Verizon Media") (together "Verizon"), alleges as follows:

### NATURE OF THE CLAIM

1.      This action is about the illusory promises that Verizon made to induce Plaintiff Jeff Lucas to join the company, and the baseless threats that Verizon used to keep Mr. Lucas from starting a position with another company.  Verizon's actions ultimately cost Mr. Lucas millions of dollars and the unique and lucrative opportunity to serve as President of Advertising Sales for WarnerMedia.

2.      Over the course of Mr. Lucas's 37-year career in the ad sales business, opportunities to lead a premier organization's global advertising sales are few and far between.  When WarnerMedia presented him with such an opportunity—to lead all of the ad sales for its high-quality, brand-safe premium television network content—it was the perfect coda to his career.  Mr. Lucas has spent decades cultivating deep roots in advertising sales related to high quality premium

television network content.  In 2018, Verizon Media lured Mr. Lucas to the position Vice President, Head of Sales for the Americas, with the promise that he would be able to continue doing this same type of work, selling high quality premium video television-type content delivered online.  As part of its pitch to Mr. Lucas, Verizon Media committed to substantially increase its inventory of online, high quality, premium brand-safe video content, premium brand-safe display content, and content marketing.  But this turned out to be a bait-and-switch.  Verizon Media never fulfilled its promise to develop such content at scale, and when WarnerMedia offered Mr. Lucas a chance to work on high quality, brand-safe premium television network video content at scale, he was interested in the opportunity to do the work that never became available at Verizon Media. But rather than work out an organized transition for Mr. Lucas to leave Verizon Media and move to WarnerMedia, Mr. Lucas was faced with threats of litigation to enforce overbroad non-competition provisions designed to intimidate and prevent him from ascending to the apex of his career, solely because Verizon Media enjoyed his overall success and did not want him to leave and work for WarnerMedia, a subsidiary of AT&T.  At the time, Verizon's threats could not be challenged due to the COVID-19-related limitations on court availability and resulted in Mr. Lucas leaving Verizon Media in May 2020 without the position with WarnerMedia secured.

3.     Despite Verizon's initial success in preventing Mr. Lucas from moving forward with the WarnerMedia position in May as a result of Verizon's threats, WarnerMedia renewed its offer to Mr. Lucas in June, a month after Mr. Lucas had left Verizon, which coincided with the expanded availability of New York State Courts.  Again, Mr. Lucas approached Verizon to understand its position now that he had not been a Verizon employee for more than a month, and still Verizon maintained its baseless position related to its unenforceable and overly broad non-competition provision, forcing Mr. Lucas to seek judicial intervention to protect his opportunity

2

and address the failure of Verizon Media to live up to its promises.  In a preliminary ruling issued on June 29, 2020, the Honorable Jennifer G. Schecter, J.S.C. held that Verizon's litigation threats were "based on what appears to be an unenforceable restrictive covenant," yet Verizon pushed forward with its threats.  WarnerMedia's job offer expired on June 30, 2020 because, even after Justice Schecter's ruling, Verizon would not stand down from its position, knowing that in doing so it would be able to prevent Mr. Lucas from moving forward with WarnerMedia.  As a result, Verizon prevented Jeff Lucas from accepting a capstone job opportunity that would have paid him approximately $4 million annually over the next three years.

## PARTIES

4.    Jeff Lucas is a resident of New York County.

5.    Verizon Communications, Inc. is a Delaware Corporation with its principal place of business in New Jersey.

6.    Verizon Media, Inc. is a Delaware Corporation with its principal place of business in New York County.

## JURISDICTION & VENUE

7.    The jurisdiction of this Court is invoked pursuant to N.Y. C.P.L.R. §§ 301 and 302. Defendants transact business in the state of New York.

8.    Venue is properly laid under CPLR § 503 and because a substantial part of the events alleged occurred within New York County.

## FACTUAL BACKGROUND

9.    Plaintiff Jeff Lucas has decades of experience in the ad sales industry. Over that period of time, he held positions at NBCU, Viacom, Snap, Inc. and Verizon Media.

3

10.     He has developed an extensive professional network of relationships during his time in the ad sales industry and has developed a reputation as an excellent leader of ad sales departments.

**Ad Sales and the Roles at Issue**

11.     It is important to differentiate between different types of advertising sales roles. The roles are based on the content tied to the ad sales (i.e., what the consumer is viewing when the consumer sees the advertisement) and the context of the content (i.e., how and when they are delivered to the consumer, whether through television, online, billboard or print). As a result, the advertising strategies and business models vary greatly because the content and how it is delivered influences how consumers are targeted and which client decision-makers are approached.

12.     The advertising sales role that Mr. Lucas sought with WarnerMedia (President, WarnerMedia Advertising Sales), and the role he previously held at Verizon Media (Head of Ad Sales North America) are entirely separate with respect to these characteristics and consequently inhabit different places in the advertising industry.

13.     First, these roles rely on two wholly distinct methods of delivery. The WarnerMedia role would have been responsible for sales of ads predominately delivered over its broadcast/cable television networks such as TNT or TBS ("Network Delivery"). Network Delivery results in broader audience targeting because the data available is more limited and the ads are distributed to a large broad-based audience at the same time. Ad sales for content that use Network Delivery is heavily reliant on contextual-based targeting strategies. Verizon Media does not deliver any of its content using Network Delivery.

14.     Mr. Lucas's role at Verizon Media, however, was exclusively related to sales of ads delivered online, through streaming, desktop or mobile web/app ("Online Delivery") for all of the

4

Yahoo (including Yahoo Mail), AOL, Huffington Post brands as well as the Microsoft brands, MSN and XBOX. Online Delivery is not tied to any set schedule, allowing the consumer to view the content on demand. Online Delivery also has more individualized data available, using deep data insights garnered from the consumer's content consumption history, location tracking, mail, mail purchase receipts, carrier data, search requests and other data points, allowing for more refined audience targeting and ads that are individualized.

15.    Ad sales for Verizon Media's non-premium content that use Online Delivery, which comprised the majority of the content Mr. Lucas sold during his time with Verizon Media, primarily use programmatic sales: an automated process that leverages the available audience information for highly targeted individualized sales that is typically independent from the content being viewed by the individual. Content does not need to be contextual in nature. Content using Online Delivery may also utilize direct sales, but it is typically limited to premium content and only made up a smaller part of the revenue Mr. Lucas generated during his time with Verizon Media. While the role with WarnerMedia may have included oversight of a very small amount of content using Online Delivery, it would have had no oversight of any programmatic sales.

16.    Second, the content sold for each of the roles is dramatically different. The WarnerMedia role is almost exclusively focused on premium video content, which is high quality, television type, brand-safe (i.e., designed to avoid associations with negative content) entertainment/news/sports/finance programming using Network Delivery ("Network Premium Video Content"). Network Premium Video Content is professionally produced, often episodic, scripted or non-scripted, with contextual sponsorship opportunities differentiating itself in the marketplace by creating a deeper resonance with the consumer. Advertisers seek to purchase Network Premium Video Content for advertisements using broad demographic information rather

than targeted individual consumer data. Network Premium Video Content advertising sales is focused on the type of viewer the content attracts using the context of the content both based on the specific content itself and where and when the content is delivered. Verizon Media does not sell any ads related to Network Premium Video Content.

17.    In Mr. Lucas's role with Verizon Media, he was primarily selling lower priced, non-premium display content, sold programmatically, which is usually an article viewed on a webpage, similar to magazine-type content. This can be premium (professionally produced, brand safe and with the ability to provide increased demand) or non-premium (generic articles and undifferentiated from other content available), and, given that it uses Online Delivery, is highly targetable using programmatic sales. Online display content was Mr. Lucas's principal focus of advertising sales during his time with Verizon Media, making up more than 85% of the revenue he generated. He also had responsibilities related to sales of premium video content that used Online Delivery, but that content was limited and did not make up a substantial part of the revenue he generated. Online display content would have been a minimal part of his responsibilities in his role at WarnerMedia with no oversight of programmatic sales.

18.    The Verizon Media position also had Online Delivered content marketing responsibilities. Content marketing is bespoke content online that may not explicitly promote a brand but is intended to stimulate interest in its products or services. Mr. Lucas's department at Verizon Media sold some premium content marketing using Online Delivery, but it was very small. The role at WarnerMedia would not have had these responsibilities.

19.    Given that the roles at issue deal with different types of content that rely on different delivery methods, the client companies would interact with them distinctly. Network Television-based advertising, like what Mr. Lucas would perform at WarnerMedia, usually has a dedicated

6

agency client buying team and associated line-item budget. Non-television advertising, primarily consisting of Online Delivered programmatic sales, typically has its own marketing budget and its own dedicated client-buying team in an agency company's marketing department. The specific client decision-makers and strategies for the ad sales related to WarnerMedia's and Verizon Media's content are distinct and thus the roles are not competitive.

**Mr. Lucas's Deep Background in Premium Ad Sales**

20.    Prior to 2016, Mr. Lucas's positions had primarily focused on ad sales related to Network Premium Video Content, specifically episodic content through his work with NBCU Entertainment, NBCU Sports/Olympics, Viacom Entertainment (Comedy Central, Spike TV), Viacom Music (MTV, VH1), and Viacom Kids (Nickelodeon).

21.    During his time at Viacom, Mr. Lucas ran advertising sales for 22 Cable Television Networks representing approximately 25% of the total television cable industry's audience. He introduced an industry leading custom cross-platform content marketing engine, Viacom Velocity, and a data-driven television ad solution called Viacom Vantage, creating and packaging targetable programmatic audience segments.

22.    Following his time at Viacom, Mr. Lucas was hired as the Global Head of Sales at Snap Inc. (then Snapchat), to develop its digital ad sales platform. At the time he began at Snap, ad sales were driven mostly by premium brand advertisers purchasing video mobile inventory to access a younger, harder to find audience. During his tenure at Snap, programmatic ad solutions were introduced and Snap's premium, professionally produced, original video television-like content was marketed as part of Snap's Discover platform.

23.    Snap's Discover Platform shows were similar to the Network Premium Video Content that Mr. Lucas had substantial experience selling during his time at Viacom, and his

experience in developing the Viacom Velocity and Vantage divisions provided a foundation for Mr. Lucas to take his premium ad sales and content creation expertise and merge it with his ad sales knowledge to further enhance the Snap ad sales platform driving the fastest revenue growth for a digital company in history at scale during his tenure.

**Verizon Media's Pitch and False Promises**

24.    In early 2018, Mr. Lucas's deep experience in Network Premium Video Content ad sales, knowledge of direct/programmatic display ad sales and extensive client contact list led Tim Armstrong, CEO and Founder of Oath (rebranded to Verizon Media in January 2019), to hire Mr. Lucas for the position of Vice President, Head of Sales for the Americas.

25.    Mr. Armstrong represented to Mr. Lucas that he would be looking to Mr. Lucas to monetize Oath/Verizon Media's soon-to-be expanded premium video content with premium brand advertisers. Mr. Armstrong expressed his vision of building a premium layer of video content sales over an existing base of premium video/display content executed programmatically using deep data insights to drive overall revenue. He discussed this in the context of possibly acquiring a Viacom-like Network Premium Video Content producer. But first, Oath/Verizon Media would need to develop incremental premium video/Display content to sell to premium content advertisers. This appealed to Mr. Lucas because of his vast experience with premium content and premium content advertisers.

26.    While discussing compensation for the position, Mr. Lucas stated that he was looking for a compensation plan similar to what he received during his time at Viacom and Snap.

27.    The initial offer from Mr. Armstrong of base salary with bonus and equity did not meet Mr. Lucas's compensation request, but to bridge the gap between the offer and the request,

8

Oath/Verizon Media offered additional compensation entirely contingent on the sales of premium content offerings at scale.

28.     Based on the stated commitment to develop Oath/Verizon Media-based owned and operated premium content, Mr. Lucas accepted a compensation package that included approximately one-third of his annual compensation (either $750,000 or $1,500,000 based on meeting certain thresholds) tied to sales of such Oath/Verizon Media owned and operated premium content broken down and described as Display Reserve (Premium Display Content), Video Reserve (Premium Video Content) and RYOT (Content Marketing), in a supplement to his employment agreement (the "Premium Content Bonus"). The Premium Content Bonus was memorialized in the Performance Bonus Program document provided with Mr. Lucas's employment agreement, both of which Mr. Lucas signed on April 18, 2018. The documentation related to the acceptance of the equity portion of Mr. Lucas's compensation, agreed to in April 2018, was first provided months later in September 2018 in the form of a Restricted Stock Unit Agreement between Mr. Lucas and Verizon Communications (the "RSU Agreement").

29.     Mr. Lucas began his position with Oath/Verizon Media in April 2018, shortly after signing the employment agreement. He was responsible for Direct/Programmatic Digital Advertising Sales in the Americas across Verizon Media (consisting of online owned and operated sites representing AOL, Huffington Post, Yahoo, Yahoo Mail, and their associated brands, as well as representing the sale of Microsoft's Global MSN and XBOX digital brand offerings), and was also responsible for the Demand Side Platform ("DSP"). The DSP programmatically sells the inventory of third-party publishers packaged with Verizon Media's owned and operated digital sites. In January 2019, the Exchange Sales Group was added to Mr. Lucas's responsibilities, which includes the programmatic sale of similar owned and operated/third party inventory to third party

9

DSPs. The revenue generated by these two programmatic groups, the DSP and the Exchange Sales Group represented approximately 85% of the revenues Mr. Lucas's advertising sales generated for Verizon Media. Direct sales of premium video/display content did not make up a substantial portion of the revenue from Mr. Lucas's department due to limited scale.

30.     These responsibilities at the time were predominantly related to programmatic ad sales rather than premium content-based ad sales. The Oath/Verizon Media premium content at that time was insubstantial, but, based on Mr. Armstrong's representations, Mr. Lucas expected it to increase. It never did in a material way. Verizon Media was unsuccessful in generating any substantial increase in its supply of Premium Display Content, Premium Video Content or Content Marketing.

31.     Upon arrival at Verizon Media, Mr. Lucas was informed he would also be overseeing a number of additional groups that provided global support to all sales: The Global Business to Business Marketing Group, The Global Client Service Organization, and The Global Business Operations Group. With respect to international sales, this responsibility was to provide support only and did not include any direct international sales responsibility, other than a very small amount related to Microsoft.

32.     As Mr. Lucas continued in his position and provided substantial value to Verizon Media, it became apparent that Verizon Media would never develop sufficient premium brand-safe monetizable content/inventory to provide Mr. Lucas with an opportunity to realize the Premium Content Bonus. In fact, Verizon Media failed to create incremental, brand-safe, premium display inventory, did not produce a material amount of owned and operated monetizable premium video inventory and generated minimal RYOT content marketing offerings in 2018/early 2019.

10

33. Mr. Lucas first brought the missing content associated with the Premium Content Bonus up with his boss, CEO Guru Gowrappan, in a conversation surrounding his first-year annual review. Mr. Gowrappan encouraged him to pursue with Human Resources what was promised. The overall review provided to Mr. Lucas was overwhelmingly positive.

34. When Mr. Lucas approached Courtney Panik and Christy Fazeli in Human Resources to discuss the impossibility of receiving the Premium Content Bonus, they spoke with the Finance department and confirmed that there was no money associated with the Premium Content Bonus. No offer of any replacement for the missing compensation was presented to Mr. Lucas.

35. On information and belief, Oath/Verizon Media had no intention, nor ability to develop sufficient premium content to give Mr. Lucas an opportunity to achieve the Premium Content Bonus, and only offered it to induce Mr. Lucas to accept the position as well as a reduced compensation package. In fact, Verizon/Verizon Media executives have stated numerous times, and as recently as January 2020 that it would not be investing in content production.

36. During Mr. Lucas's time at Verizon Media, despite his extraordinary performance, which included turning around Mr. Gowrappan's sales department, building a new diverse, strong senior sales management team and generating tens of millions of dollars in incremental revenues, Mr. Lucas's role had been reduced (the Latin American responsibilities were moved to International) and was further limited when, in March 2019, Mr. Gowrappan hired his good friend and former boss Iván Markman as Chief Business Officer ("CBO").

37. In January 2019, Mr. Gowrappan, asked Mr. Lucas to shift his reporting line from reporting directly to Mr. Gowrappan to the incoming CBO, Mr. Markman. Earlier in his career, Mr. Markman had hired Mr. Gowrappan to work for him at Yahoo. Mr. Gowrappan stated that he

Case 1:20-cv-05542   Document 1-2   Filed 07/17/20   Page 44 of 58

needed one of his "own people" as a direct-report because the majority of his other direct-reports were former Verizon corporate employees. He told Mr. Lucas that he would not be successful unless he could hire Mr. Markman and asked if Mr. Lucas would help him out.

38.     Mr. Gowrappan promised Mr. Lucas that in return for agreeing to report to Mr. Markman, he would expand Mr. Lucas's responsibilities from North America sales to include all International Ad Sales. Mr. Gowrappan also introduced the possibility of moving Ecommerce to expand Mr. Lucas's scope of responsibilities

39.     Mr. Gowrappan also committed to Mr. Lucas that Mr. Markman would not interact externally with clients.

40.     Mr. Gowrappan never moved international ad sales to Mr. Lucas.

41.     Mr. Gowrappan never moved any Ecommerce responsibilities to Mr. Lucas to expand the scope of his responsibilities

42.     Mr. Markman upon arrival immediately requested a list of the top clients that he should meet and then proceeded to regularly meet with clients despite Mr. Gowrappan's assurances to the contrary.

43.     Throughout 2019 and until the time of his departure on May 8, 2020, Mr. Lucas was the head of North America Ad Sales and Global Client Solutions (International sales support functions, almost no direct International sales responsibility).

**Mr. Lucas's Opportunity with WarnerMedia and Verizon's Threats**

44.     On December 11, 2019, AdAge, a well-known publication in the advertising industry, published an article covering the changes in broadcast/cable television ad sales leadership in 2019. It noted that the only open television ad sales leadership position not filled was WarnerMedia's global head of ad sales.

12

45.     In the AdAge article, Mr. Lucas's was the only name mentioned as a possible candidate to fill the WarnerMedia vacancy, and the author referenced Mr. Lucas's experience at Viacom, including his involvement with the development of Viacom Vantage and Velocity, as why she believed Mr. Lucas would be the right candidate for the role. The role would leverage Mr. Lucas's experience in the traditional TV business, as well as digital, social and programmatic ad sales.

46.     Mr. Lucas was surprised to see his name mentioned in the article, but agreed with the author's assessment and thought the WarnerMedia position would be the opportunity that his 35 plus-year career had been building to. And at the age of 59, he did not expect there to be similar opportunities in the future.

47.     The vacant title at WarnerMedia was "President, WarnerMedia Advertising Sales," and its responsibilities include overseeing WarnerMedia's media and premium episodic television based content, multiplatform advertising strategies and initiatives across WarnerMedia's portfolio of television network brands (CNN, HLN, TNT, TBS, truTV, Cartoon Network, Adult Swim). It would return Mr. Lucas to a position with a similar scope as his responsibilities at NBC and Viacom, and to a role similar in geographic scale to Snap. It would also allow him to return to work with creators of premium television content, which was not available at Verizon Media. The WarnerMedia position would not include oversight responsibilities for programmatic ad sales, which made up the majority of Mr. Lucas's responsibilities at Verizon Media.

48.     On December 14, 2019, shortly after the AdAge article was published, Mr. Markman sent Mr. Lucas a text message attaching the article with a question mark in the text.

13

49.    Mr. Gowrappan proceeded to contact Mr. Lucas on December 17, 2019 while Mr. Lucas was out of the country on vacation suggesting Mr. Lucas call him.  Mr. Lucas complied and called him that evening.

50.    During their phone call, Mr. Gowrappan mentioned he heard a rumor that Mr. Lucas was leaving Verizon Media to go to WarnerMedia.  Mr. Lucas suggested that Mr. Gowrappan did not hear a rumor, but had read it in an AdAge article.  Mr. Gowrappan agreed and asked Mr. Lucas whether he was looking for another position and mentioned that he valued loyalty. Mr. Lucas replied that he was not in the market looking for another position and that he receives calls periodically about other positions when they open up, even though they are rarely opportunities he would consider.  Mr. Lucas mentioned that when other companies approach him, he will usually listen.  Mr. Lucas stated that he did not have a contractual commitment and that he listened because he would always want to do what is best for his family for the time remaining in his career.

51.    As the call continued, Mr. Lucas asked Mr. Gowrappan if he would speak with a much larger company if the company called to recruit him into a CEO role.  Mr. Gowrappan replied yes, but stated that he has a two-year commitment remaining to Verizon Media and was not able to move now.  Mr. Gowrappan ended the call by telling Mr. Lucas that Mr. Lucas has been delivering great results and that he did not feel good about the recent article.

52.    The following morning, Mr. Markman attempted to contact Mr. Lucas while Mr. Lucas was still on vacation and later texted Mr. Lucas that "Guru didn't get the warm and fuzzy on this one based on your guys call.  Will try later to make sure we are clear".  Mr. Lucas responded and after playing phone tag for a day, Mr. Lucas spoke with Mr. Markman about his conversation with Mr. Gowrappan.

14

53.     When he spoke with Mr. Markman, Mr. Lucas reviewed his conversation with Mr. Gowrappan and the questioning of loyalty.  Mr. Lucas stated to Mr. Markman that Mr. Lucas did not have a contractual commitment with Verizon Media, and that he only wants to do what is best for his family over the remaining years in his career.  Mr. Lucas mentioned that he was promised a number of things by Verizon Media when hired, which Mr. Gowrappan knew about, and then again by Mr. Gowrappan in January 2019 that were never delivered, including responsibility for International Sales and the possible movement of ECommerce to Mr. Lucas.  Mr. Lucas also mentioned the Premium Content Bonus that he was promised when hired, which represented approximately one third of his total compensation package and never realized.  Mr. Markman confirmed that Mr. Gowrappan had mentioned to him that Mr. Lucas was not happy about the unavailability of the Premium Content Bonus.  Mr. Markman also asked that if Mr. Lucas were ever considering another opportunity, he should approach Mr. Markman first before accepting an offer to see if there was anything Mr. Markman could do to keep him at Verizon Media and expressed how well Mr. Lucas had performed at Verizon Media and they wanted him to stay.

54.     At no time during that call or any other communication in 2019 or early 2020, did Mr. Gowrappan or Mr. Markman mention any non-competition restriction, nor did either state that the WarnerMedia position would violate any terms of Mr. Lucas's agreements with Verizon.

55.     In early 2020, Mr. Lucas engaged in detailed discussions with WarnerMedia regarding the vacant position described in AdAge.  As those discussions turned serious, Mr. Lucas decided to follow the guidance of Mr. Markman and let him know over the last week of February that he received a serious offer from WarnerMedia and that he wanted to accept the position.  The offer was for a three-year term, with compensation of approximately $4,000,000 per year.  Mr.

15

Lucas verbally communicated the details of the offer to Mr. Markman during the week of February 27, 2020, and later via text on March 3, 2020.

56.    Mr. Lucas had multiple conversations with Mr. Markman and Andy Nebens (Chief People Officer) during the first week of March to discuss his intent to accept the WarnerMedia position and the timing and process of a transition.  In the first conversation with Mr. Nebens, Mr. Nebens offered a potential increase in compensation to get him to stay with Verizon Media.  Mr. Lucas kindly refused and stated that he wanted to return to selling premium television content (Network Premium Video Content) and work with premium television content creators again, an opportunity which never materialized at Verizon Media.

57.    At their next meeting, Mr. Nebens informed Mr. Lucas that he had agreed to a non-compete.  Mr. Lucas informed Mr. Nebens that he did not recall ever discussing or agreeing to a non-compete, nor seeing it in his employee agreement.  Mr. Nebens informed Mr. Lucas it was not in his employment agreement but instead attached as an exhibit to his RSU Agreement, which he accepted five months after starting with Verizon Media.  Mr. Lucas suggested that burying the non-compete deep in the small print of the RSU Agreement already promised at the time of hiring was sneaky.  Mr. Nebens smiled and told Mr. Lucas he could not agree to that description.

58.    On March 13, 2020, Verizon Media's outside counsel sent a letter to Mr. Lucas's attorney threatening to bring legal action and asserting that the positions they believed Mr. Lucas was contemplating with WarnerMedia and Xandr (another AT&T subsidiary) were in violation of the non-competition provisions in exhibits to the RSU Agreement he signed during his employment with Verizon Media.  The Verizon Media attorney requested a copy of the description of the WarnerMedia role (and Xandr role, though one had never been discussed) and sought confirmation that Mr. Lucas was in compliance with his confidentiality obligations.

16

59.    Having nothing to hide, on March 17, 2020, Mr. Lucas's attorney provided a description of the WarnerMedia position demonstrating that the position was not competitive.  On March 19, 2020, Mr. Lucas's attorney followed up with a letter explaining that Verizon Media and WarnerMedia could not compete because the content at issue was of an entirely different nature: Mr. Lucas was unable to sell ads related to Network Premium Video Content at Verizon Media, instead selling direct and programmatic ads, primarily for display content; Network Premium Video Content ad sales would be his primary responsibility at WarnerMedia, which was virtually absent at Verizon Media; and he would have no responsibility for programmatic ads at WarnerMedia, which was the main source of advertising sales revenue at Verizon Media. (Although Xandr does offer programmatic solutions, this was not the role he was considering.) Furthermore, he was in compliance with all confidentiality provisions, and the differing nature of the work meant that the little, if any, confidential Verizon Media information in his possession of which he may be aware would not be of much use to WarnerMedia.

60.    Following extensive discussions and correspondence, Verizon Media continued to threaten legal action to enforce the non-competition provisions in the exhibit to the equity agreements if Mr. Lucas were to move forward with the WarnerMedia position.

61.    In response and in an effort to clarify and potentially address Verizon Media's concerns, Mr. Lucas requested that Verizon Media identify the basis for its assertion that the WarnerMedia position would violate any enforceable non-competition restriction.  Such an explanation never came; Verizon Media only identified general job responsibilities and simply stuck by its assertion that the positions were competitive because Mr. Lucas would be selling ads and performing similar functions.

17

62.      Verizon Media intentionally ignored the fundamental differences between the responsibilities of each position.  These included differences between the companies' inventories of content, that Mr. Lucas would be selling ads related to Network Premium Video Content unavailable at Verizon Media, the differences between the strategies and way in which ad sales for premium episodic television content (such as WarnerMedia's content) differs from display/programmatic content (such as Verizon Media's content), and that Mr. Lucas was simply not privy to any information that would give WarnerMedia any advantage.

63.      For Mr. Lucas, the opportunity at WarnerMedia was what was missing from Verizon Media, though promised to him when he started.  There was virtually no premium video content to sell and no way to interact with the content creators and put together advertising strategies leveraging premium video content.  He was stuck selling almost exclusively direct/programmatic non-premium lower priced display content, which was not the type of work he was promised when he accepted the position at Verizon Media and not the type of work he wanted to continue doing as his career was at its height.

64.      In an April 3, 2020 letter from Verizon Media, however, the company's real reason for threatening Mr. Lucas with legal action was laid bare: "the Company hopes Mr. Lucas remains a Verizon Media employee."  Given Mr. Lucas's track record at Verizon Media of course they wanted to keep him in his position: he was an excellent employee, at a bargain rate, because more than a third of the compensation he was promised in 2018 and 2019 was simply not achievable and never delivered.

65.      When Mr. Lucas reported Verizon Media's position to WarnerMedia, WarnerMedia was clear that it would not be able to hire him with the threat of litigation looming

18

from Verizon Media.  Verizon Media's bad faith threat of litigation would cost Mr. Lucas the biggest opportunity of his career.

66.     What is more, during this time Mr. Lucas had no ability to challenge Verizon Media's position as the courts in New York were closed in light of the COVID-19 pandemic, and while the matter was important to him, it was not essential and would have to wait until the environment improved.

67.     Having considered his options, Mr. Lucas notified Mr. Markman on April 17, 2020, that despite Mr. Lucas's multiple offers to work out an amicable transition, Mr. Lucas's last day would be May 4, 2020.  Mr. Lucas felt that Verizon Media and Verizon Media's lawyers were not operating in good faith, and merely stalling in order to block the chance for Mr. Lucas to join WarnerMedia because it was owned by AT&T.  Mr. Lucas was told numerous times by both Mr. Markman and Mr. Nebens that Verizon would not be as tough on enforcing the non-compete if WarnerMedia was not owned by AT&T, but they never elaborated on what that actually meant.

68.     Both Mr. Markman and Mr. Nebens stated that Verizon has to send a message to AT&T and other Verizon employees that they could not leave Verizon to work at AT&T.  Mr. Lucas was told by both Mr. Markman and Mr. Nebens that if they let Mr. Lucas go to AT&T, how, for example, could they say no to Verizon Consumer Group EVP & CEO, Ronan Dunne, if he wanted to leave to go to work for AT&T or T-Mobile.  During that conversation, it was also discussed that the courts are not open to challenge Verizon Media's decision that Mr. Lucas's offered position at WarnerMedia was violating a non-compete provision.

69.     Mr. Lucas decided to leave Verizon regardless, and resigned effective as of May 8, 2020, four days later than originally planned, at Mr. Markman's request to facilitate better messaging.

19

70.     When Mr. Lucas resigned, he did not have a position in place and believed that the opportunity with WarnerMedia was lost.  In conversation the week of April 21, 2020, following the date Mr. Lucas notified Verizon Media of his plans to leave, Mr. Lucas informed Mr. Nebens that he felt the WarnerMedia opportunity was lost and Mr. Nebens suggested once again that Mr. Lucas should remain with Verizon Media since he had no job offer pending.  Mr. Lucas declined.

71.     However, discussions with WarnerMedia resumed since his departure and WarnerMedia formally reinstated its original offer to Mr. Lucas contingent on providing an assurance that Verizon would not bring an action seeking to enforce the restrictive covenant.  The offer would expire on June 30, 2020.

72.     On June 5, 2020, by letter, Mr. Lucas sought an assurance from Verizon that it would not continue its threat of litigation given that the non-competition provision was not enforceable with respect to the WarnerMedia position and he was no longer a Verizon Media employee.

73.     Instead, on June 12, 2020, despite not being a Verizon Media employee for more than a month, Verizon Media continued its baseless threat, focused solely on its assertion that WarnerMedia is a competitor and Mr. Lucas would be performing similar functions for WarnerMedia as he performed for Verizon Media.

74.     Mr. Lucas was therefore compelled to seek judicial intervention to protect the job opportunity with WarnerMedia (which was set to expire on June 30, 2020) and address the failure of Verizon Media to live up to its promises and he instituted this action on June 22, 2020.  By order to show cause, Mr. Lucas sought a preliminary injunction and temporary restraining order that would restrain and enjoin Defendants from taking any and all actions to enforce against Plaintiff the terms of Exhibit B of the 2018 RSU Agreement, and more specifically, from enforcing such terms as against Plaintiff with respect to his employment with WarnerMedia, and in particular, in the role

20

President, WarnerMedia Advertising Sales. The matter was assigned to Justice Jennifer G. Schecter in the Commercial Division.

75.     In opposition to Mr. Lucas's claims, Verizon focused almost exclusively on its belief that Mr. Lucas would have direct involvement with Xandr, not on Mr. Lucas's position with WarnerMedia, information that Verizon failed to include in its April 3, 2020 letter or any other letter thereafter, including its June 12, 2020 letter.  Recognizing the weakness of its position vis-à-vis WarnerMedia, Verizon grasped at a potential relationship with Xandr, which still would not have been sufficient to enforce a non-competition provision.

76.     During a preliminary conference with Justice Schecter on June 25, 2020, the Court urged the parties to find a resolution to the dispute, while recognizing that restrictive covenants are subject to strict scrutiny.  Over the next several days the parties engaged in dialogue but could not reach an agreement whereby Verizon would commit not to interfere with Mr. Lucas's intention to accept the position with WarnerMedia.

77.     On June 29, 2020 Justice Schecter issued a decision and order on Mr. Lucas's motion.  Therein the Court held that Mr. Lucas "established a likelihood of success on the merits by demonstrating that the restrictive covenant is likely unenforceable…."  With the benefit of this decision, through counsel, Mr. Lucas expressed his intent to accept the offer with WarnerMedia and start work immediately.  It its last communication to Mr. Lucas, on June 30, 2020 at 3:49 p.m., Verizon claimed that despite Justice Schecter's clear indication that Verizon did not have a sufficient business interest to protect, it would not agree to stand down if Mr. Lucas accepted the position at WarnerMedia.  With the baseless threats from Verizon lingering, Mr. Lucas could not freely accept the offer from WarnerMedia, and it expired on June 30, 2020.  As of the filing of the Amended Complaint, the position has not yet been filled.

21

78.     On information and belief, Verizon knew that by continuing its position with respect to the position at WarnerMedia, despite not having a valid legitimate business interest in enforcing the non-competition restriction, it would be able to succeed in its goal to prevent Mr. Lucas from moving forward with the position at WarnerMedia.  As such, Verizon's conduct was willful and malicious.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Tortious Interference with Business Relations

79.     Mr. Lucas repeats and realleges the allegations set forth in paragraphs 1 through 78 as if fully set forth herein.

80.     Mr. Lucas had a business relationship with WarnerMedia and an offer of employment for the position of President, WarnerMedia Advertising Sales for a three-year term with annual compensation of approximately $4,000,000.

81.     Mr. Lucas disclosed this relationship to Defendants, including the offer of employment.

82.     Defendants threatened to initiate litigation to enforce non-competition provisions that Defendants knew are not enforceable with respect to the position of President, WarnerMedia Advertising Sales.

83.     On information and belief, Defendants knew that through their threat to initiate such action they would prevent Mr. Lucas from being able to move forward with the position at WarnerMedia.

84.     Defendants' threat of litigation caused the offer of employment for the position of President, WarnerMedia Advertising Sales to be rescinded.

85.     Defendants' actions were intentional and malicious.

22

86.     As a result of the foregoing, because the employment offer was rescinded due to Defendants' baseless threats, Mr. Lucas sustained and will continue to sustain irreparable harm to his career and severe economic injury for which he is entitled to monetary compensation in an amount to be determined at trial but in any event not less than $12,000,000 in addition to punitive damages.

## SECOND CAUSE OF ACTION
### Fraudulent Inducement to Contract

87.     Mr. Lucas repeats and realleges the allegations set forth in paragraphs 1 through 86 as if fully set forth herein.

88.     Prior to entering into an employment agreement with Defendants, Tim Armstrong, CEO of Oath now Defendant Verizon Media, represented that Oath would continue and increase development of premium content.

89.     Mr. Armstrong knew that it was not true, but made the statement to induce Mr. Lucas to accept approximately one-third of his compensation in the form of bonus compensation related to advertising sales relating to the premium content, the Premium Content Bonus.

90.     Mr. Lucas relied on Mr. Armstrong's representation and entered into the employment agreement.

91.     After he started in his role with Defendants, Mr. Lucas learned that there would not be sufficient premium content for him to achieve the Premium Content Bonus promised to him when he entered into the employment agreement.

92.     Defendants' actions were intentional and malicious.

93.     As a result of the foregoing, Mr. Lucas has been harmed in an amount to be determined at trial, but in no event less than seven hundred fifty thousand dollars ($750,000) for

each of the two years he worked for Defendants, totaling one million, five hundred thousand dollars ($1,500,000), in addition to punitive damages.

**THIRD CAUSE OF ACTION**
**<u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>**

94.    Mr. Lucas repeats and realleges the allegations set forth in paragraphs 1 through 93 as if fully set forth herein.

95.    Implied in all contracts, including the April 18, 2018 employment agreement and Performance Bonus Program between Oath (now Verizon Media) and Mr. Lucas, is a covenant of good faith and fair dealing, which is breached when a party to the contract acts in a manner that, although not constituting a breach of contract, deprived the other party to the contract the right to receive the benefit of the agreement.

96.    Mr. Lucas performed all of his material obligations under the Employment Agreement and Bonus Program to the extent possible.

97.    Defendants failed to provide the premium content required for him to satisfy the conditions of the Performance Bonus Program, undermining the spirit of the agreement between the parties and breaching the implied covenant of good faith and fair dealing.

98.    Defendants' actions were intentional and malicious.

99.    As a result of the foregoing, Mr. Lucas has been damaged in an amount to be determined at trial, but in no event less than seven hundred fifty thousand dollars ($750,000) for each of the two years he worked for Defendants, totaling one million, five hundred thousand dollars ($1,500,000), in addition to punitive damages.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff Jeff Lucas respectfully requests that this Court enter judgment and grant the following relief:

24

a.    Award Plaintiff an amount of not less than twelve million dollars ($12,000,000) as a result of Defendants' tortious interference in Plaintiff's relationship with WarnerMedia;

b.    Award Plaintiff an amount of not less than one million, five hundred thousand dollars ($1,500,000) as a result of Defendants' fraudulent inducement;

c.    Award Plaintiff an amount of not less than one million, five hundred thousand dollars ($1,500,000) as a result of Defendants' breach of the covenant of good faith and fair dealing;

d.    Award Plaintiff punitive damages in an amount to be determined at trial;

e.    Award Plaintiff costs and expenses of this action together with reasonable attorneys' fees; and

f.    Such other and further relief as this Court deems just and proper.


Dated: New York, New York
       July 17, 2020

**HOGUET NEWMAN
REGAL & KENNEY, LLP**

By: _____

Damian R. Cavaleri
Steven M. Silverberg
Miriam J. Manber

Hoguet Newman
Regal & Kenney, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808

*Attorneys for Plaintiff
Jeff Lucas*

25

Case 1:20-cv-05542   Document 1-2   Filed 07/17/20   Page 58 of 58

## VERIFICATION

STATE OF NEW YORK    )
                                 ) ss.:
COUNTY OF NEW YORK  )

      Jeff Lucas, being duly sworn deposes and says, that deponent is the plaintiff in this

action; that deponent has read the foregoing Verified Complaint and knows the contents thereof;

that the same is true to deponent's own knowledge, except as to the matters therein stated to be

alleged upon information and belief, and as to those matters, believes to be true.


Jeff Lucas

Sworn to before me this
16th day of July, 2020

Notary Public

Damian Cavaleri
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02CA62353ED
Qualified in New York County
Commission Expires 03/31/2023

26